## City of Pittsburgh v. Wilson

*Hugh F. McGough* and *Jacqueline R. Morrow,* for plaintiff.

*Joshua M. Bloom,* for defendants.

WETTICK JR., *A.J.,* October 3, 2005—This is a declaratory judgment action brought by the City of Pittsburgh.[1] The city seeks the entry of a judgment declaring that the law permits the city to use a polygraph procedure to disqualify applicants for firefighter positions. In their answer to the city's amended complaint, defendants also seek declaratory relief. They request this court to enter a judgment declaring that the city violated the law by disqualifying applicants on the basis of information acquired through the city's polygraph procedure.

The city accepted applications for employment as firefighters during April 2005 and administered a written test on May 10, 2005. A list ranking 438 applicants by test score was publicly posted on July 8, 2005.

---

1. The hearing was held on September 29, 2005. There is no transcript. My findings of fact are based on my notes.

Prior to August 1, 2005, candidates in the top third of the list completed a candidate processing form in which they answered questions regarding various matters including residency, education, military service, employment history, driving record, history of illegal drug use or sale, and criminal background. The city's Office of Municipal Investigations conducted background investigations on these candidates, starting at the top of the eligibility list. The office searched police records, driving history, military records, and other sources to confirm the accuracy and completeness of the information on the processing form. Former employers and educational institutions were also contacted.

As one component of this pre-employment screening, candidates were given polygraph tests. Each test was performed by a certified polygraph examiner. If a candidate had refused to take the polygraph test, he or she would not have been hired.[2]

Before conducting the polygraph test, the examiner obtained background information from the candidate, who knew at that time that a polygraph test was to be conducted. At the conclusion of this interview, each candidate was attached to the polygraph and asked the following 12 questions:

(1) Is your name _____?

(2) Regarding this examination, do you intend to answer each question truthfully?

(3) Did you lie about your employment history?

(4) Did you ever abuse a position of trust?

(5) Did you lie about your drug related activities?

(6) Did you ever cheat on your income tax?

2. No candidate refused to take the test.

(7) Did you ever commit a serious undetected crime?

(8) Did you ever lie on your resume?

(9) Did you lie about what you've ever stolen?

(10) Did you ever lie to a person of authority?

(11) Did you lie about anything on your pre-polygraph questionnaire?

(12) Did you ever knowingly violate an employer's policy or procedure?

Both plaintiff and defendants state that under Civil Service legislation that governs the city's hiring of firefighters, the fire chief is required to hire candidates from the top of the list but may pass over a candidate "for just cause." The fire chief passed over approximately 20 candidates as a result of background information which the candidate furnished to the polygraph examiner.

The city anticipates that many of these candidates who were passed over will be challenging their disqualification on the ground that the city was not permitted to require the candidates to take polygraph tests. Consequently, the city seeks a ruling at this time on the legality of the requirement that the candidates participate in the polygraph procedure in order to remain on the list of applicants. Otherwise, if a court, at some later date, determines that the candidates were wrongfully disqualified, the city might be required to pay back wages to persons who have not performed any services for the city.

The following legislation pertains to polygraph tests:

"18 Pa.C.S. §7321. Lie detector tests

"(a) Offense Defined.—A person is guilty of a misdemeanor of the second degree if he requires as a condi-

tion for employment or continuation of employment that an employee or other individual shall take a polygraph test or any form of a mechanical or electrical lie detector test.

"(b) Exception.—The provisions of subsection (a) of this section shall not apply to employees or other individuals in the field of public law enforcement or who dispense or have access to narcotics or dangerous drugs."

## I.

In its request for declaratory relief, the city seeks a declaration that the exception in the Lie Detector Tests Law applies to Pittsburgh firefighters.[3] Defendants' request for declaratory relief is broader. They seek a ruling that the exception does not apply; thus, under section 7321(a), the city is prohibited from requiring the candidates to take a polygraph test as a condition for employment. In the alternative, defendants seek a declaration that even if the exception applies to Pittsburgh firefighters, state civil service legislation does not permit the city to conduct polygraph tests as part of the process for hiring firefighters.[4]

### A.

I now consider the city's contention that Pittsburgh firefighters are "in the field of public law enforcement,"

_____

3. There is no case law construing this exception.

4. In this litigation, defendants do not claim that the fire chief did not have good cause to pass over defendants if the law permitted him to make use of information that the applicants furnished to the polygraph examiner.

as this term is used in the exception within the Lie Detector Tests Law.

Pittsburgh firefighters are the first responders to medical emergencies. They also perform functions traditionally performed by firefighters that are related to fire prevention and fire fighting: They respond to fires, gas leaks, electric lines that are down, and automobile accidents.[5]

The term "field of public law enforcement" is not defined. Consequently, it should be construed according to its plain meaning. *McKelvey v. McKelvey,* 771 A.2d 63 (Pa. Super. 2001). Firefighters who respond to medical emergencies are not "in the field of public law enforcement" under any reasonable reading of this provision.

I also conclude that firefighters performing the traditional duties of firefighters are not employees in the field of public law enforcement because firefighters have no authority to make arrests and, with the exception of the Fire Prevention Code, firefighters do not enforce the criminal laws of this Commonwealth.

At the time of the enactment of the Lie Detector Tests Law, the General Assembly was very aware that there were two essential components to public safety: firefighters who prevent and control fires, and police officers who enforce the criminal laws of the Commonwealth.[6] The term "field of public law enforcement"

---

5. In responding to automobile accidents, they perform two functions. They determine whether there is the possibility of fire and whether there is a medical emergency.

6. Different legislation governs firefighters and police officers. See *e.g.,* the Firemen's Civil Service Law (Act of June 27, 1939, P.L. 1207, as amended, 53 P.S. §23491 et seq.) and the Policemen's Civil Service

clearly reaches police officers. If the General Assembly had intended to include the second essential component in this exclusion, it would have specifically referred to firefighters. It would not have shown its intent to include firefighters performing their traditional functions by using a term that appears to apply only to individuals charged with enforcing the criminal laws of the Commonwealth.

The city contends that firefighters should be characterized as employees in the field of public law enforcement because under Pittsburgh ordinances, firefighters enforce the Fire Prevention Code and are authorized to issue citations for violations of this Code. However, this does not change the essential role of firefighters. To the contrary, the General Assembly has continued to this day to segregate the traditional roles of firefighters and police officers by placing the power to make arrests only in the hands of police officers.

In addition, the city assigns a very small number of firefighters to work in the field of fire protection and only these firefighters are authorized by the city to issue citations for violations of the Fire Prevention Code. According to the testimony offered in these proceedings, only four individuals may issue citations at this time. Consequently, if there is any merit to the city's argument that firefighters who enforce the Fire Prevention Code through the issuance of citations are employees in the field of public law enforcement, the exception to the Lie Detector Tests Law should govern only firefighters who are assigned to enforce the Fire Prevention Code. These

---

Law (Act of August 10, 1951, P.L. 1189, as amended, 53 P.S. §23531 et seq.).

firefighters could be given polygraph tests at the time they are assigned to enforce the Fire Prevention Code (assuming that they are employees in the field of public law enforcement). See *e.g., Fraternal Order of Police Lodge No. 5 v. City of Philadelphia,* 118 Pa. Commw. 132, 546 A.2d 137 (1988).

## B.

I next consider the city's contention that the prohibition against the use of polygraph tests does not apply to Pittsburgh firefighters because of the exception for persons who "dispense or have access to narcotics or dangerous drugs."[7] This argument would have no merit if Pittsburgh firefighters performed only the work that firefighters have traditionally performed. However, in the 1980s, Pittsburgh firefighters became the first responders to medical emergencies. This is a substantial portion of the work of the Pittsburgh firefighters.[8] Testimony establishes that firefighters were the first responders for medical emergencies on more than 12,000 occasions in the past year (there were approximately 24,000 additional responses that did not involve medical emergencies).

---

7. Every employee of the City of Pittsburgh might dispense drugs that he or she is not authorized to dispense or might have access to drugs by being where he or she should not be. However, a reading of the exception in this fashion would produce an absurd result: the prohibition against administering polygraph tests would not apply to any city employees. The exception should, instead, be read as applying to persons who, as part of their job responsibilities, dispense or have access to narcotics or dangerous drugs.

8. Effective January 1, 2005, all newly hired firefighters are required to earn and maintain a Pennsylvania Emergency Medical Technician Certificate.

Testimony establishes that, on most occasions, the firefighters are at the scene of a medical emergency at least several minutes before the city paramedics arrive. One truck containing four firefighters responds to each medical emergency. Three of the four firefighters enter the building to provide assistance. Their responsibilities include gathering relevant information concerning the medical condition of the person with a medical emergency ("patient") for use by the paramedics. This information includes the preparation of a list of medications which the patient is taking. Frequently, the firefighters must examine the vials and pillboxes containing the medication to prepare this list of medications. If medication, as is frequently the case, is located outside the presence of the patient (usually, according to the testimony, in a medicine cabinet or on a dining room/kitchen table), the firefighter may move the medicine to a location near the patient (usually near a bed which the patient is occupying and where the remainder of the patient's medicine is kept).

Usually, the medicine handled by firefighters does not include a narcotic. However, much of the medicine is obtained by prescription.

I find that the plain meaning of "individuals who have access to dangerous drugs" includes persons whose job responsibilities include having possession, custody, or control (temporarily or permanently) of drugs. Dictionaries define "access" as the right to make use of; the ability to obtain or make use of; obtainable; and the opportunity to obtain (Merriam-Webster Online Dictionary; Compact Oxford Dictionary; Webster's New Universal Unabridged Dictionary, Delux second edition). There are

no definitions which support defendants' position that the firefighters do not have "access" to drugs.

The exception in the Lie Detector Tests Law applies to individuals who dispense or have access to *"dangerous"* drugs. Defendants contend that "dangerous" drugs refer to illegal drugs. This contention has no merit because no employee, as part of his or her job responsibilities, dispenses illegal drugs.

A dangerous drug is a drug that can cause harm. Almost any medicine for which a prescription is required can cause harm. Otherwise, the medicine would be available over the counter.

For these reasons, I rule that Pittsburgh firefighters, because of their role as the first responders to medical emergencies, have access to dangerous drugs within the meaning of the exception in the Lie Detector Tests Law.

## II.

I next address defendants' contention that the fire chief did not have authority to require candidates to undergo polygraph tests as a condition of employment.[9]

### *A.*

Defendants contend that state law prohibits the city from adopting any Home Rule Charter provisions, ordinances, or regulations that require candidates for

---

9. The city does not contest defendants' contention that if the fire chief was not permitted to require candidates to take polygraph tests, the fire chief could not make any use of information that candidates furnished the examiner. See *e.g., Kroen v. Bedway Security Agency Inc.,* 430 Pa. Super. 83, 92-93, 633 A.2d 628, 633 (1993).

firefighter positions to undergo polygraph testing. Defendants rely on the following provision in the General Civil Services Act:

"*Section 23431. Appointments, promotions, etc., to be based on fitness; preference to honorably discharged soldiers; 'civil service' defined*

"On and after the first day of July, one thousand nine hundred and seven, appointments to, and promotions in, the civil service of the cities of the second class shall be made only according to qualifications and fitness, to be ascertained by examinations, which, so far as practicable, shall be competitive, as hereinafter provided. On and after the said date, no person shall be appointed, transferred, reinstated, or promoted, as an officer, clerk, employee, or laborer, in the civil service under the government of any city of the second class, in any manner or by any means other than those prescribed in the act: Provided, however, That among those persons possessing equal qualifications and eligible for appointment to any office preference in appointment shall be given to honorably discharged soldiers and sailors who served in the Army or Navy of the United States during the War of the Rebellion, or to honorably discharged soldiers, sailors, and marines, who served in the armed forces of the United States or its Allies during its war against the Imperial German Government: Provided further, however, That if the preference hereby provided for be for any reason invalid, all the other provisions of this act shall remain in force with like effect as if said preference had not been contained therein, it being the intention of the legislature not to make the other provisions of the act dependent upon the validity of said preference.

"The term 'civil service' of a city shall include all offices, positions, and employments, in which the officers or employees are paid by the city treasurer, either directly or through some official or agent, and all offices, positions, and employments, in or under institutions, departments, boards, or commissions, wherein the city, through any official or board or commission, has the exclusive right to select the officials and employees.

"1907, May 23, P.L. 206, §1. Amended 1919, May 8, P.L. 118, §1." 53 P.S. §23431.

This civil service legislation governs only cities of the second class. Consequently, under the ruling of the Commonwealth Court in *Fraternal Order of Police v. City of Pittsburgh,* 165 Pa. Commw. 83, 644 A.2d 246 (1994), the city has the authority under the Home Rule Charter Law to adopt provisions in its Home Rule Charter, ordinances, or regulations that supersede or are inconsistent with this civil service legislation.

In *Fraternal Order of Police v. City of Pittsburgh, supra,* the city enacted an ordinance which authorizes the Civil Service Commission to certify individuals to entry-level police officer positions without regard to ranking on eligibility lists secured through civil service testing. The ordinance provides that police officer positions may be filled without competition for applicants who have at least one year of law enforcement experience and hold a current certification as a police officer or are able to obtain such a certification. Under this ordinance, the director of public safety is permitted to fill vacancies on the basis of background investigations as to prior employment and experience, relevant education and character without reliance on any competitive testing for

candidates with at least one year of law enforcement experience.

The Fraternal Order of Police sought declaratory and injunctive relief on the ground that the ordinance was inconsistent with the hiring procedures set forth in the Policemen's Civil Service Act governing cities of the second class. The Commonwealth Court rejected this argument, stating that under the Home Rule Charter Law, the city may enact legislation that is inconsistent with state law except for acts of the General Assembly that are uniform and applicable throughout the Commonwealth. This means that the city may enact legislation that supersedes state legislation governing the hiring of firefighters where the state legislation applies only to cities of the second class.

## B.

Defendants may also be contending that the fire chief has not been given authority to decide whether to utilize polygraph testing as part of the screening process.[10]

Case law holds that a bureau chief may not require candidates for employment within the bureau to submit to a polygraph test unless a municipal law, expressly or by implication, authorizes the bureau chief to impose this requirement. See *Fraternal Order of Police Lodge No. 5 v. City of Philadelphia, supra; Marion v. Green,* 95 Pa. Commw. 210, 505 A.2d 360 (1986), *petition for allowance of appeal denied,* 514 Pa. 633, 522 A.2d 560

---

10. Testimony established that the fire chief made the decision to utilize polygraph testing. He testified that the police and EMS bureaus were using the same polygraph procedure in screening candidates.

(1987); and *DeVito v. Civil Service Commission of the City of Philadelphia,* 404 Pa. 354, 172 A.2d 161 (1961).[11]

The city contends that the laws of the city provide that each bureau chief has the responsibility to decide whether to utilize polygraph testing as part of the background screening for positions within the bureau. The city relies on section 116.02(a) of the Home Rule Charter which reads as follows:

"The chiefs of the respective bureaus of the Department of Public Safety shall have the following powers and duties:

"(a) The care, management, administration and supervision of police, fire emergency medical forces and the city's emergency communication system."

I agree with the city that the power and duty given to the fire chief to manage and administer the city's Fire Bureau includes the authority to develop procedures for obtaining information that may establish just cause for passing over a candidate on the competitive list. Furthermore, it cannot be contended that a polygraph test is an inappropriate test for determining the suitability of a candidate for a firefighter position. Through 18 Pa.C.S. §7321(b), the legislature has made the determination that this is a tool that an employer may elect to use to obtain background information of job applicants who, if hired, will have access to dangerous drugs. In its brief, the city states that there is no requirement in the city charter, or elsewhere, that each bureau's procedures for screening candidates be subject to Civil Service Regulations. Defendants have not brought to this court's attention any

---

11. I recognize that the city contends that this line of cases applies only to existing employees.

provisions in the city's Home Rule Charter or any city ordinances or regulations that would restrict the authority of the fire chief, as manager and administrator of the Fire Bureau, to use a polygraph procedure as a component of background screening of firefighter candidates.[12]

For these reasons, I enter the following order of court:

## ORDER

On October 3, 2005, upon consideration of the parties' request for declaratory relief, it is hereby ordered that a judgment is entered declaring that the fire chief has the authority to require candidates for firefighter positions to take polygraph tests.

---

12. In this litigation, there is no evidence that any candidate was disqualified because the polygraph examiner believed that the candidate's answers were not truthful. The city justifies the use of its polygraph procedures on the ground that many candidates responded to the procedure by furnishing more accurate or more complete information that the candidate should have disclosed on his or her Candidate Processing Form. Thus, issues concerning the reliability of a polygraph examination, raised in cases such as *Anderson v. City of Pittsburgh,* 845 F.2d 1216 (3d Cir. 1988), do not apply.